**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| WENDY LADDY, | ) | CASE NO. 4:11-cv-293 |
| | ) | |
| Plaintiff, | ) | JUDGE WELLS |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | VECCHIARELLI |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | **REPORT AND RECOMMENDATION** |

Plaintiff, Wendy Laddy ("Plaintiff"), challenges the final decision of Defendant,

Michael J. Astrue, Commissioner of Social Security ("the Commissioner"), denying her

applications for a Period of Disability ("POD") and Disability Insurance Benefits ("DIB"),

and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security

Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("the Act").  This Court has jurisdiction

pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States

Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a

Report and Recommendation.  For the reasons set forth below, the Magistrate Judge

recommends that the Commissioner's final decision be AFFIRMED.

## I.   PROCEDURAL HISTORY

On January 11, 2008, Plaintiff protectively filed applications for a POD, DIB, and SSI and alleged a disability onset date of October 11, 2007.  (Tr. 78.)  Plaintiff's applications were denied initially and upon reconsideration, so Plaintiff requested a hearing before an administrative law judge ("ALJ").  (Tr. 78.)  On October 26, 2009, an ALJ held Plaintiff's hearing.  (Tr. 78.)  Plaintiff appeared, was represented by an attorney, and testified.  (Tr. 78.)  A vocational expert ("VE") also appeared and testified. (Tr. 78.)

During the hearing, the ALJ expressed concern that Plaintiff had produced very few medical records in support of her claims of disability, and that there was no physical consultative examination of Plaintiff.  (Tr. 62-63.)  The ALJ indicated that she would hold the record open for twenty days to receive any supplemental medical records, send Plaintiff for a physical consultative examination, and send counsel a copy of the consultative examiner's report when it was completed.  (Tr. 63, 65, 70.)

On January 14, 2010, the ALJ found Plaintiff not disabled.  (Tr. 86.)  The ALJ noted that, as of the date of her decision, Plaintiff had not submitted any supplemental evidence and had not requested additional time to submit such evidence.  (Tr. 78.)  On December 7, 2010, the Appeals Council declined to review the ALJ's decision, so the ALJ's decision became the Commissioner's final decision.  (Tr. 1.)

On February 10, 2011, Plaintiff timely filed her complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  On September 7, 2011, Plaintiff filed her Brief on the Merits.  (Doc. No. 16.)  On November 7, 2011, the Commissioner filed his Brief on the Merits.  (Doc. No. 18.)  Plaintiff did not file a Reply Brief.

2

Plaintiff asserts four assignments of error:  (1) the ALJ violated her due process rights by failing to proffer a consultative examiner's post-hearing report in conformity with HALLEX I-2-7-30, 1993 WL 643048 (S.S.A.);[1] (2) the ALJ improperly gave the opinions of Plaintiff's treating physician less than controlling weight; (3) the ALJ failed to discuss and explain the weight given to third-party reports; and (4) the ALJ failed to assess Plaintiff's obesity.

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Plaintiff was 42 years old on her alleged disability onset date and 45 years old on the date of her hearing.  (Tr. 44, 85.)  She has at least a high school education and is able to communicate in English.  (Tr. 85.)  She has past relevant work as a cook, seamstress, monitor, and telemarketer.  (Tr. 85.)

### B.    Medical Evidence Before the ALJ During Plaintiff's Hearing

On April 19, 2006, Plaintiff presented to Dr. Lisa Weiss, M.D., with complaints of headaches, nausea, sinus pressure and drainage, and itching.  (Tr. 286.)  Dr. Weiss's physical examination of Plaintiff was essentially normal.  (*See* Tr. 287-88.)  Dr. Weiss assessed Plaintiff with a viral infection, hypertension, and fibromyalgia; and indicated that Plaintiff's fibromyalgia "is probably worse because of the viral illness."  (Tr. 288-89.)  Dr. Weiss recommended that Plaintiff continue to take her medication and follow up at

---

[1] "HALLEX" is the acronym for the Hearings, Appeals and Litigation Law Manual of the Social Security Administration, which sets forth safeguards and procedures for the agency's administrative proceedings.  *See Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 397 (6th Cir. 2008); *Robinson v. Barnhart*, 124 F. App'x 405, 410 (6th Cir.2005).

a later date.  (*See* Tr. 289.)

On October 11, 2007, state agency reviewing psychological consultant Caroline Lewin, Ph.D., performed a psychiatric review technique and assessed Plaintiff's mental RFC.  (Tr. 307-24.)  In the psychiatric review technique, Dr. Lewin assessed Plaintiff under affective disorders and anxiety disorders and determined that Plaintiff was moderately limited in her abilities to maintain social functioning, concentration, persistence, or pace; and mildly limited in her ability to perform activities of daily living.  (Tr. 311, 321.)  Dr. Lewin further determined that Plaintiff suffered no episodes of decompensation.  (Tr. 321.)  As to Plaintiff's mental RFC assessment, Dr. Lewin determined that Plaintiff was moderately to not significantly limited.  (Tr. 307-08.)

On February 5, 2008, Plaintiff presented to Dr. Ciby Luke, M.D., at Family Practice Center with complaints of coughing, fever, chills, fatigue, depression, and hypertension.  (Tr. 290-91.)  Dr. Luke assessed Plaintiff with a viral infection, depression or anxiety, and hypertension.  (Tr. 292.)  Dr. Luke started Plaintiff on "zpak" for her viral infection and Celexa for her depression, and refilled her hypertension medication.  (Tr. 292.)  On March 14, 2008, Plaintiff returned to Dr. Luke for a follow-up to increase her dosage of Celexa, as Plaintiff reported her depression had only slightly improved.  (Tr. 294.)  Dr. Luke increased Plaintiff's dosage of Celexa.  (Tr. 295.)

On March 19, 2008, Plaintiff underwent a consultative psychological examination with John J. Brescia, M.A., at the request of the Bureau of Disability Determination.  (Tr. 297-306.)  Mr. Brescia reported that Plaintiff arrived at the examination alone, and that Plaintiff reported the following.  (Tr. 298.)  Plaintiff drove herself to the examination location.  (Tr. 297.)  She was disabled by fibromyalgia and migraine headaches, which

4

she had been suffering since 1991.  (Tr. 299.)  She suffered headaches three or four times a week.  (Tr. 299.)  She also had trouble sleeping because of pain in her neck and back.  (Tr. 301.)  She currently took Imitrex for her migraines and aspirin on occasion.  (Tr. 299.)  She had taken many different medications for her pain over the years, but the medications made her ill.  (Tr. 299.)  At one of her prior employment positions, she had to "call off many times."  (Tr. 299.)

Plaintiff also suffered hypertension and depression.  (Tr. 299.)  She explained that she had been suffering depression for the past six months, recently graduated from college, was concerned that she would not be able to obtain a job because of her headaches, and harbored guilt and regrets about "a lot of things" including "not bringing in money."  (Tr. 301.)

Plaintiff lived with her twenty-year-old daughter and six-month-old granddaughter.  (Tr. 304.)  Plaintiff's daughter was about to join the National Guard, so Plaintiff planned to take care of her granddaughter.  (Tr. 304.)  Plaintiff spent most of her time taking care of her granddaughter, using a computer, and watching television. (Tr. 304.)  She could load and unload the dishwasher, prepare baby bottles, and give her granddaughter a bath.  (Tr. 304.)  She had a driver's license and could drive and get around by herself, but she usually went places with her daughter.  (Tr. 304.)

Mr. Brescia concluded that Plaintiff had average cognitive functioning and moderate to serious symptoms of depression and anxiety; and assigned Plaintiff a Global Assessment of Functioning ("GAF") score of 55.[2]  (Tr. 304-05.)

---

[2] A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  A person who scores in

5

On April 20, 2008, Plaintiff presented to her local emergency room with complaints of ongoing cough and chest pain.  (Tr. 326.)  She was diagnosed with acute bronchitis and allergic rhinitis, and she was release with instructions on how to care for herself at home and to follow up at Family Practice Center.  (Tr. 334-37.)

On May 22, 2009, Plaintiff began presenting to Dr. Kelly Tomasic, M.D., for general health management.  (Tr. 373.)  On that day, Dr. Tomasic reported the following.  Plaintiff complained of hot flashes and reported that she had a hysterectomy in 2002.  (Tr. 373.)  Plaintiff also reported that she had been suffering pain from fibromyalgia in her back for the past 19 years.  (Tr. 373.)  Dr. Tomasic noted that Plaintiff had a history of hypertension, fibromyalgia, migraine headaches three to four times a week, depression, and hemorrhoids.  (Tr. 373.)  Dr. Tomasic assessed Plaintiff with hot flashes, depression, fibromyalgia, and migraine headaches; and she prescribed Plaintiff hormone medication and Cymbalta.  (Tr. 374.)

On May 26, 2009, Plaintiff presented to Dr. Tomasic with a complaint of hemorrhoids (Tr. 370); and on May 29, 2009, Plaintiff successfully underwent surgery to remove them (Tr. 368).

On June 19, 2009, Plaintiff presented to Dr. Tomasic with complaints of migraine headaches and hot flashes.  (Tr. 366.)  Dr. Tomasic indicated that Plaintiff reported having migraines three to four times a month, each episode lasting three to six days at a time.  (Tr. 366.)  Dr. Tomasic continued Plaintiff on her present medications,

---

this range may have a flat affect, occasional panic attacks, few friends, or conflicts with peers and co-workers.  *See Diagnostic and Statistical Manual of Mental Disorders* 34 (American Psychiatric Association, 4th ed. rev., 2000).

increased her hormone medication, started Plaintiff on Amitriptyline, and instructed Plaintiff to follow up in one month.  (Tr. 366.)

On July 27, 2009, Plaintiff followed-up with Dr. Tomasic regarding Plaintiff's migraine headaches.  (Tr. 364.)  Dr. Tomasic indicated that Plaintiff reported the Amitriptyline helped her, as she had not been having crying spells and her migraine headaches were "back to her baseline, which is approximately 7-10 days without headaches and then 3-4 days of headaches in a cycle."  (Tr. 364.)  Plaintiff was curious about other medications for fibromyalgia and reported some generalized pain, although the worst pain was in her lower back after a long day of work.  (Tr. 364.)  Upon physical examination, Dr. Tomasic reported "no tenderness to palpation over [Plaintiff's] cervical or thoracic spine region, but . . . mild tenderness along the paraspinal muscles in the lumbar region."  (Tr. 364.)  Dr. Tomasic further reported that Plaintiff had "no pain in the buttocks," and "[n]o radiation of this pain down the legs, tingling or other neurologic deficits."  (Tr. 364.)  Dr. Tomasic continued Plaintiff on her medications and instructed Plaintiff to follow up in one month.  (Tr. 364.)

On August 25, 2009, Plaintiff followed up with Dr. Tomasic regarding her migraines and fibromyalgia.  (Tr. 362.)  Dr. Tomasic indicated that Plaintiff continued to complain of "various joint pains as well as back pain," and that Plaintiff reported "that she hurts everywhere."  (Tr. 362.)  Upon physical examination, however, Dr. Tomasic reported "[n]o tenderness to palpation," and that Plaintiff had normal sensation to light touch in all four extremities.  (Tr. 362.)  Dr. Tomasic indicated that she would decrease Plaintiff's dosage of Amitriptyline and start Plaintiff on Lyrica.  (Tr. 362.)

On October 5, 2009, Plaintiff presented to Dr. Tomasic to follow up on her

7

migraine headaches and have her disability paperwork filled.  (Tr. 359.)  Dr. Tomasic indicated that Plaintiff continued to complain of recurrent migraine headaches, which were caused or aggravated by light, noise, and stress.  (Tr. 359.)  Dr. Tomasic also indicated that Plaintiff's fibromyalgia "has been slightly increased with the Amitriptyline," and that Plaintiff continued to complain of "various aches and pains in her upper body." (Tr. 359.)  Dr. Tomasic's physical examination of Plaintiff, however, was unremarkable. (*See* Tr. 359.)

Dr. Tomasic filled out a "fibromyalgia residual functional capacity quastionaire" and indicated the following.  (Tr. 350-51.)  She had been treating Plaintiff since March 2009.  (Tr. 351.)  Plaintiff suffered a variety of symptoms including multiple tender points, pain in 11 or more pressure points, chronic fatigue, morning stiffness, and muscle weakness.  (Tr. 350.)  Plaintiff could frequently lift and carry 20 pounds and occasionally lift and carry 10 pounds.  (Tr. 351.)  She could work for only 2 hours a day. (Tr. 351.)  She could sit, stand, and walk for 30 minutes at a time and for a total of 60 minutes in a workday.  (Tr. 351.)  She could never stoop, and occasionally would need to lie down.  (Tr. 351.)  She could lift both arms above shoulder level occasionally.  (Tr. 351.)  Plaintiff would likely be absent from work more than four times a month.  (Tr. 351.)  Nevertheless, Plaintiff would be able to perform low-stress jobs, although she required the opportunity to shift positions among sitting, standing, and walking at will; and would need to take four to five unscheduled breaks of between 15 and 30 minutes each during an 8-hour workday.  (Tr. 350-51.)  Dr. Tomasic indicated that Plaintiff's "[l]imitations have been ongoing for [the] last 20 [years] or more," and that Plaintiff "has been evaluated by numerous specialists."  (Tr. 351.)

8

Dr. Tomasic also filled out a "headache residual functional capacity" form and indicated the following.  (Tr. 352-53.)  Plaintiff suffered migraine headaches one to two times a week or four to six times a month that were triggered by alcohol, bright lights, noise, strong odors, lack of sleep, stress, vigorous exercise, hunger, and weather changes.  (Tr. 352.)  Bright lights, coughing, bowel movements, physical movement, and noise made the migraines worse.  (Tr. 352.)  Lying down, medication, lack of noise, darkness, and cold packs helped alleviate her migraines.  (Tr. 352.)  Positive test results of Plaintiff's migraines were tenderness, impaired appetite, and impaired sleep. (Tr. 352.)  Plaintiff could tolerate low work stress, but she would need to take 4 to 5 unscheduled breaks for 15 minutes each in a working day and she could be expected to be absent from work more than four days a month.  (Tr. 353.)  Plaintiff's migraine condition could be expected to last for more than 12 months, and Plaintiff would generally be precluded from performing even basic work activities while suffering a migraine.  (Tr. 353.)

Finally, Dr. Tomasic filled out a medical statement concerning Plaintiff's depression and anxiety and indicated the following.  (Tr. 354-55.)  Plaintiff was markedly impaired in her abilities to perform activities of daily living and maintain social functioning.  (Tr. 354.)  Plaintiff also had deficiencies in concentration, persistence, or pace that would result in an inability to complete tasks in a timely manner; and Plaintiff had repeated episodes of decompensation.  (Tr. 354.)

On November 2009, Plaintiff returned to Dr. Tomasic, and Dr. Tomasic indicated that Plaintiff reported decreased muscle spasms after taking Lyrica, although she continued to have generalized aches her joints.  (Tr. 358.)

9

###### C.     Third-Party Statements

On September 4, 2009, Plaintiff's friend of 11 years, Mr. Henry Diamond, reported the following on third-party questionnaires regarding Plaintiff's obesity, headaches, and anxiety.  (Tr. 219-32.)  Plaintiff's daily activities were moderately restricted by her obesity, and her social functioning was mildly restricted.  (Tr. 218-19.)  Specifically, Mr. Diamond had observed Plaintiff "back out of social events due to her negative self image and back pain."  (Tr. 220.)  Plaintiff's migraine headaches occurred 3 to 4 times a week, and each episode lasted 3 to 4 days.  (Tr. 225.)  Plaintiff's activities of daily living and social functioning were markedly impaired by her anxiety.  (Tr. 232.)

On September 14, 2009, Plaintiff's husband, Mr. Paul K. Laddy, reported the following on third-party questionnaires regarding Plaintiff's obesity, headaches, and anxiety.  (Tr. 217-32.)  Plaintiff's daily activities were markedly restricted by her obesity, and her social functioning was mildly restricted.  (Tr. 221-22.)  Specifically, Plaintiff's "social life is diminished to the point she won't go out," and it was "hard [for Plaintiff] to breath [sic] climbing stairs."  (Tr. 222.)  Plaintiff's migraine headaches occurred 3 to 4 times a week, and each episode lasted "several days."  (Tr. 227.)  Plaintiff's activities of daily living were moderately impaired by her anxiety, and her social functioning was markedly impaired.  (Tr. 234.)

On October 2, 2009, Plaintiff's mother, Ms. Joy Hinchcliffe-Mulhall, reported the following on third-party questionnaires regarding Plaintiff's obesity, headaches, and anxiety.  (Tr. 217-32.)  Plaintiff's daily activities were mildly restricted by her obesity, and her social functioning was moderately restricted.  (Tr. 217-18.)  Specifically, Plaintiff "has difficulty lifting, bending, and at times walking."  (Tr. 218.)  Plaintiff's migraine

headaches occurred 3 times a week, and each episode lasted "several days."  (Tr. 223.)  Plaintiff's activities of daily living and social functioning were markedly impaired by her anxiety.  (Tr. 230.)

### D.    Hearing Testimony and Post-hearing Medical Evidence

#### 1.    Plaintiff's Hearing Testimony

Plaintiff testified as follows.  Plaintiff lived in a two-story house with her husband.  (Tr. 45.)  She washed dishes with a dishwasher, dusted, did grocery shopping, cooked, and did some laundry (although she could not pick the laundry up).  (Tr. 46.)  She cooked dinner twice a week, but the meals usually were simple because standing for too long bothered her back and feet.  (Tr. 49.)  She did not vacuum often or do yard work.  (Tr. 46.)  She had a driver's license and could drive, but she could not sit in her car for more than 30 minutes without needing to shift her position or get up and move, as her joints and back would become stiff.  (Tr. 46-47.)  She could sit comfortably for approximately five minutes.  (Tr. 48.)  She could stand in one place for approximately ten minutes and walk less than one city block.  (Tr. 48.)  She could lift a ten-pound bag of potatoes, but it would cause her pain.  (Tr. 48.)

Plaintiff had trouble sleeping and awoke around 10:00 or 11:00 in the morning.  (Tr. 48.)  She had no hobbies and spent most of her day watching television.  (Tr. 46, 48.)

Plaintiff began presenting to her treating physician, Dr. Tomasic, in May 2009.  (Tr. 49-50.)  Plaintiff did not attend mental health counseling.  (Tr. 50.)  Plaintiff took Imitrex for her migraine headaches and Lyrica for her fibromyalgia, but the Imitrex made

11

Plaintiff feel ill and the Lyrica made Plaintiff "kind of loopy."  (Tr. 52.)  She did not suffer

side effects from her other medications.  (Tr. 52.)

Plaintiff's fibromyalgia "flared up" a couple times a week, and the pain lasted

between a couple of hours to a couple of days at a time.  (Tr. 60-61.)  Plaintiff suffered

pain everywhere on her body, and in different places at different times.  (Tr. 57.)  She

rated her pain rated at 7 on a scale of 10 in severity on most days.  (Tr. 57.)

Debilitating episodes of pain occurred approximately once a month.  (Tr. 61.)  She

suffered such pain since 1990, although she was diagnosed with fibromyalgia in 1999,

and it routinely interfered with her employment experiences over the years.  (Tr. 61-62.)

She had taken many different pain medications in the past to no avail; and she had not

"noticed a single bit of difference" with Lyrica.  (Tr. 58.)

Plaintiff suffered migraine headaches two or three times a week; and her

medication often was of little help because she awoke with the headaches and they

took four of five hours to dissipate.  (Tr. 59.)

### 2.    Vocational Expert's Hearing Testimony

The ALJ posed the following hypothetical to the VE:

> I want you to assume an individual with the Claimant's age, education and
> past work experience . . . and further assume this individual has the following
> limitations; that the individual would be limited to sedentary work, it must
> have sit/stand option, cannot engage in any stooping and only occasionally
> raise their arms above shoulder level, would be limited to occupations
> requiring no more than simple routine repetitive tasks that are not performed
> in a fast-paced production environment, could only make simple work-related
> decisions and relatively few workplace changes and would be limited to
> occupations that require no more than occasional interaction with
> supervisors, co-workers and members of the public.

(Tr. 68.)  The VE testified that such a person could not perform Plaintiff's past relevant

12

work, but that such a person could perform other work as, for example, a ticket checker (for which there were 70,000 jobs nationally), surveillance monitor (for which there were 50,000 jobs nationally), charge account clerk (for which there were 40,000 jobs nationally), and order clerk (for which there were 20,000 jobs nationally).  (Tr. 68-69.)

The ALJ posed a second hypothetical:  "In this hypothetical we're going to assume that in addition to the limitations previously described[,] this individual also would require frequent breaks and absences at will."  (Tr. 69.)  The VE testified that such a person would not be able to perform the jobs to which he previously testified. (Tr. 69.)  The VE further testified that her testimony was consistent with the Dictionary of Occupational Titles.  (Tr. 69.)

### 3.    The ALJ's Concerns with Plaintiff's Medical Evidence

The ALJ expressed concern that Plaintiff had produced very few medical records in support of her claims of disability.  (Tr. 63.)  The ALJ noted that although he had Dr. Tomasic's reports, those reports were summaries of Plaintiff's residual functional capacity ("RFC") without any supporting documentation.  (Tr. 63.)  She also noted that there was no physical consultative examination of Plaintiff.  (Tr. 62-63.)

Plaintiff conceded that her lack of medical records in the administrative record was a problem.  (*See* Tr. 66.)  The ALJ indicated that she would hold the record open for twenty days to receive any supplemental medical records,[3] send Plaintiff for a physical consultative examination, and send counsel a copy of the examiner's report

---

[3]  In this Court's view, this was clear notice and an invitation to Plaintiff's counsel to supplement the record with evidence from Dr. Tomasic that supported that doctor's RFC.

13

when it was completed.  (Tr. 63, 65, 70.)

### 4.    Post-hearing Medical Report from Dr. Magoline

On December 1, 2009, Dr. Michael R. Magoline, M.D., performed a consultative orthopedic examination of Plaintiff at the request of the state agency.  (Tr. 381-95.)  Dr. Magoline reported that Plaintiff complained of pain throughout her entire body, including her neck, lower back, and upper and lower extremities, and that the pain itself was disabling.  (Tr. 386.)  Upon physical examination, Dr. Magoline indicated that Plaintiff "denies pain with palpation of both the upper extremities," but thereafter indicated that "with palpation of the soft tissues the claimant complained of subjective pain with any type of pressure on the skin with palpation everywhere."  (Tr. 387.)

Dr. Magoline further reported the following upon physical examination.  Plaintiff muscle strength was normal.  (Tr. 382.)  Plaintiff's abilities to pick up coins or keys, write, hold a cup, open a jar, button or unbutton, manipulate a zipper, and open a door were normal.  (Tr. 383.)  Plaintiff exhibited no muscle spasms or muscle atrophy.  (Tr. 383.)  Her range of motion in her cervical spine, shoulders, elbows, hands, and fingers were normal.  (Tr. 383-84.)  Specifically regarding the effect of obesity on Plaintiff's range of motion, Dr. Magoline further found that Plaintiff's range of motion in her dorsolumbar spine, hips, knees, and ankles were normal.  (Tr. 384-85.)

Dr. Magoline assessed Plaintiff's physical ability to perform work-related activities as follows.  Plaintiff could lift and carry up to 20 pounds continuously and 50 pounds occasionally.  (Tr. 389.)  She could sit for six hours total in an 8-hour workday, and for 2 hours at a time without interruption.  (Tr. 390.)  She could stand for 4 hours total in an 8-hour workday, and for 2 hours at a time without interruption.  (Tr. 390.)  She could

14

walk for 2 hours total in an 8-hour workday, and for 1 hour at a time without interruption. (Tr. 390.)  She could occasionally reach over her head, push, and pull with both hands; and she could frequently reach in all other directions, handle, finger, and feel with both hands.  (Tr. 391.)  She could occasionally operate foot controls with both feet.  (Tr. 391.)  She could occasionally climb stairs and ramps, balance, stoop, and kneel; and she could never climb ropes and ladders, crouch, or crawl.  (Tr. 392.)  She could frequently tolerate operating a motor vehicle; occasionally tolerate being around moving mechanical parts, humidity, wetness, and noise; and never tolerate unprotected heights, dust, odors, fumes, other pulmonary irritants, extreme cold, extreme heat, and vibrations.  (Tr. 393.)

Based on the assessment of Plaintiff's physical impairments, Dr. Magoline opined that Plaintiff would be able to go shopping; travel without a companion for assistance; ambulate without an assistive device; walk a block at a reasonable pace on rough or uneven surfaces; use standard public transportation; climb a few steps at a reasonable pace with the use of a single hand rail; prepare simple meals and feed herself; care for her personal hygiene; and sort, handle, or use paper or files.  (Tr. 394.)

Dr. Magoline concluded that Plaintiff has an "essentially normal orthopedic examination . . . other than her subjective complaints of pain with palpation of the soft tissues consistent with her fibromyalgia."  (Tr. 387.)  Dr. Magoline continued that, "[f]rom an orthopedic standpoint she would be more suited to sedentary work only."  (Tr. 387.)

### III.    STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when she establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y*

*of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 *and* 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience.  20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does

prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

## IV.   SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.   The claimant meets the insured status requirements of the Social Security Act through December 31, 2012.

2.   The claimant has not engaged in substantial gainful activity since October 11, 2007, the alleged onset date.

3.   The claimant has the following severe impairments:  fibromyalgia, migraine cephalgia, depressive disorder, and an anxiety disorder. . . . Furthermore, at 5'1" in height and weighing 201 pounds, the claimant is obese.

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work . . . except with a sit/stand option; the claimant can raise her arms above shoulder level on no more than an occasional basis; the claimant is limited to simple, routine, and repetitive tasks which are not performed in a fast-paced production environment; the claimant is limited to simple, work-related decisions and relatively few workplace changes; the claimant should have no more than occasional interactions with supervisors, coworkers, or members of the general public.

6.   The claimant is unable to perform any past relevant work.

. . . . .

9.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

17

10.     Considering the claimant's age, education, work experience, and
residual functional capacity, there are jobs that exist in significant
numbers in the national economy that the claimant can perform.

11.     The claimant has not been under a disability, as defined in the Social
Security Act, from October 11, 2007 through the date of this decision.

(Tr. 80-86.)

## V.     LAW & ANALYSIS

### A.     Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether

the Commissioner's decision is supported by substantial evidence and was made

pursuant to proper legal standards.  *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512

(6th Cir. 2010).  Review must be based on the record as a whole.  *Heston v. Comm'r of*

*Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The court may look into any evidence in

the record to determine if the ALJ's decision is supported by substantial evidence,

regardless of whether it has actually been cited by the ALJ.  *Id.*  However, the court

does not review the evidence *de novo*, make credibility determinations, or weigh the

evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir.

1989).

The Commissioner's conclusions must be affirmed absent a determination that

the ALJ failed to apply the correct legal standards or made findings of fact unsupported

by substantial evidence in the record.  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281

(6th Cir. 2009).  Substantial evidence is more than a scintilla of evidence but less than a

preponderance and is such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion.  *Brainard*, 889 F.2d at 681.  A decision supported by

18

substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.  *Ealy*, 594 F.3d at 512.

### B.    Plaintiff's Due Process Claim

The ALJ obtained Dr. Magoline's report after Plaintiff's hearing and relied on it as support for her decision.  Pursuant to HALLEX I-2-7-30, when an ALJ receives additional evidence after a claimant's hearing from a source other than the claimant or the claimant's representative and proposes to admit the evidence into the record, the ALJ must proffer the evidence, that is, give the claimant and her representative the opportunity to examine the evidence and comment on, object to, or refute it.[4]  HALLEX I-2-7-30 § A; *see Adams v. Massanari*, 55 F. App'x 279, 286 (6th Cir. 2003) (per curiam).  The proffer must be presented in a letter that gives the claimant a time limit to object to, comment on, or refute the evidence; submit a written statement as to the facts and law that the claimant believes apply to the case in light of the evidence submitted; submit written questions to be sent to the author of the proffered evidence; or exercise her rights with respect to requesting a supplemental hearing and the opportunity to cross-examine the author of any post-hearing report if it is determined by the ALJ that such questioning is needed to inquire fully into the issues.  HALLEX I-2-7-30 § B.  The proffer letter also must advise the claimant that she may request a subpoena to require the attendance of witnesses or the submission of records, and

---

[4]  An ALJ must proffer all post-hearing evidence unless:  (1) the evidence was submitted by the claimant or the claimant's representative and there is no other claimant to the hearing; (2) the claimant knowingly waived her right to examine the evidence; or (3) the ALJ proposes to issue a fully favorable decision.  HALLEX I-2-7-30 § A.  None of these exceptions apply here.

advise her of the procedures for requesting and issuing a subpoena.  *Id.*  Upon receiving comments on the proffered evidence from a claimant, the ALJ must address the comments in the rationale of her written decision, make a formal ruling in the decision or by separate order on any objections to the proffered evidence, and make the ruling a part of the record.  *Id.* § H.

Plaintiff explains that, on December 26, 2009, her counsel received a copy of Dr. Magoline's report with a cover letter from the ALJ's Senior Case Technician that stated only the following:  "enclosed please find the Consultative Examination Report authored by Michael R. Magoline, M.D. dated December 18, 2009 for your review."[5]  (Pl.'s Br. 12-13.)  Plaintiff continues that, because the ALJ did not provide an explanation of Plaintiff's rights to challenge Dr. Magoline's report and a time limit within which Plaintiff could do so, as required by HALLEX I-2-7-30, Plaintiff's counsel assumed the ALJ intended to issue a fully favorable decision and, therefore, did not challenge Dr. Magoline's report.  Accordingly, Plaintiff concludes, the ALJ deprived her of a full and fair hearing.  Plaintiff contends that she was prejudiced by the ALJ's inadequate proffer letter because, "had [Plaintiff] been advised that comment on the proffered evidence

---

[5]  Plaintiff notes that the cover letter is not in the administrative record; suggests that the failure to include the letter in the administrative record was a violation of HALLEX 1-2-7-30 § C; and indicates that a copy of the letter is filed with Plaintiff's Brief on the Merits as "Exhibit 1."  (Pl.'s Br. 13 n.1.)  Plaintiff did not, however, attach or otherwise file any exhibits, including the cover letter.  Further, Plaintiff does not explain how any failure to include the letter in the record violated HALLEX, violated her rights, or warrants remand.  Accordingly, the Court need not consider this issue further.  *See Rice v. Comm'r of Soc. Sec.*, 169 F. App'x 452, 454 (6th Cir.2006) ("It is well-established that 'issues averted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.'") (quoting *McPherson v. Kelsey*, 125 F.3d 989, 995–996 (6th Cir.1997)).

was sought by the ALJ (i.e. a favorable decision was not in the offering), her attorney would have commented on Dr. Magoline's qualifications" and argued that Dr. Magoline's opinions are unsupported. (Pl.'s Br. 13-14.)

The Commissioner does not dispute that the ALJ sent Plaintiff a proffer letter lacking the content required by HALLEX I-2-7-30. Rather, the Commissioner contends that any failure of the ALJ to send Plaintiff a sufficiently informative proffer letter was harmless, as Plaintiff and her counsel already knew the ALJ was concerned with the lack of evidence in the record; there was no basis for Plaintiff's counsel to assume the ALJ would issue a fully favorable decision because it is clear upon reading Dr. Magoline's report that it does not support the conclusion that Plaintiff was disabled; and that, despite giving weight to Dr. Magoline's report, the report was not a significant factor in the ALJ's decision because the ALJ relied on the record as a whole as the basis for her decision—including the lack of objective evidence of Plaintiff's impairments.[6]

For the following reasons, Plaintiff has failed to persuade the Court that the ALJ's failure to comply with HALLEX I-2-7-30 violated Plaintiff's due process rights in this case.

Due process requires that a social security hearing be "full and fair." *Flatford v. Chater*, 93 F.3d 1296, 1305 (6th Cir.1996) (quoting *Richardson v. Perales*, 402 U.S. 389, 401-02 (1971)). A claimant must have the opportunity to present all of her evidence and to confront the evidence against her. *See id.* at 1306. Although the

---

[6] Neither party cites any case law in support of their positions.

Commissioner may consider evidence obtained post-hearing, _id._ at 1303, the claimant must be given an opportunity to review such evidence and, if desired, an opportunity to cross-examine the authors or otherwise rebut such evidence, _Watkins v. Sec'y of Health & Human Servs._, 7 F.3d 237 (Table), 1993 WL 393075, at *1 (6th Cir. Oct. 4, 1993) (collecting cases).  A failure to provide a claimant with a post-hearing report may constitute a violation of the claimant's due process rights.  _See_ _Watkins_, 1993 WL 393075, at *2.

Here, the ALJ gave Plaintiff Dr. Magoline's report with a note indicating that the report was sent to her so that she could review it.  Plaintiff's argument that the ALJ deprived Plaintiff of a full and fair hearing because she failed to include in her proffer letter a notice of Plaintiff's rights and a time frame within which to exercise them is a _non sequitur._  There was no basis for Plaintiff's counsel to assume that the ALJ intended to issue a fully favorable decision and that a challenge to Dr. Magoline's report was unnecessary, particularly because (1) counsel was on notice that the lack of evidence in the record was troubling to the ALJ, (2) the ALJ indicated that she wanted Plaintiff to review the report; and (3) Dr. Magoline's report clearly supported the conclusion that Plaintiff was not disabled.  Moreover, regardless of whether Plaintiff knew of her rights, counsel is responsible for knowing and protecting his client's rights; and Plaintiff was afforded time to challenge Dr. Magoline's report, as the ALJ waited three weeks after sending the report to Plaintiff before rendering a decision.

The facts of this case show that counsel's unfounded assumption and apparent lack of diligence caused Plaintiff to lose of the opportunity to challenge Dr. Magoline's

22

report, not the ALJ's failure to provide certain information in her proffer letter pursuant

to HALLEX I-2-7-30.  Plaintiff also has not cited any case law in support of the

proposition that the ALJ's mere failure to comply with HALLEX I-2-7-30 violated due

process.  Because Plaintiff has failed to show that the ALJ's failure to comply with

HALLEX I-2-7-30 deprived her of a full and fair hearing, or that the failure to comply

with HALLEX I-2-7-30 otherwise violated due process, this assignment of error lacks

merit.

   **C.**   **The ALJ's Assessment of Plaintiff's Treating Physician**

   Plaintiff contends that the ALJ failed to give good reasons for rejecting the

opinions of Plaintiff's treating physician, Dr. Tomasic.  For the following reasons, this

assignment of error lacks merit.

   An ALJ must give the opinion of a treating source controlling weight if she finds

the opinion well-supported by medically acceptable clinical and laboratory diagnostic

techniques and not inconsistent with the other substantial evidence in the case record.

*Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. §

404.1527(d)(2)) (internal quotes omitted).  Conversely, a treating source's opinion may

be given little weight if it is unsupported by sufficient clinical findings and is inconsistent

with the rest of the evidence.  *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993).

If an ALJ decides to give a treating source's opinion less than controlling weight, she

must give "good reasons" for doing so that are sufficiently specific to make clear to any

subsequent reviewers the weight given to the treating physician's opinion and the

reasons for that weight.  *See Wilson*, 378 F.3d at 544 (quoting S.S.R. 96-2p, 1996 WL

374188, at *5 (S.S.A.)).

Here, the ALJ gave Dr. Tomasic's opinions little weight for three reasons:

- "Dr. Tomasic is a general practitioner with no specialized expertise in either neurological or autoimmune disorders";

- "Dr. Tomasic's treating relationship with [Plaintiff] appears to have been limited to monthly visits from approximately July [to] November, 2009"; and

- "Dr. Tomasic fails to cite an objective basis for her opinion and appears to rely too heavily upon [Plaintiff's] subjective complaints." (Tr. 84-85.)

A physicians lack of specialization in the area of medicine in which she offers an opinion may constitute a good reasons for giving the treating physician's opinion little weight. See Turley v. Sullivan, 939 F.2d 524, 527 (8th Cir. 1991) (per curiam) ("As with any expert witness, the treating physician's opinion is subject to criticism as being outside his or her area of expertise."). So, too, may a relatively short treatment relationship and the lack of clinical and diagnostic findings constitute good reasons. See Barker v. Shalala, 40 F.3d 789, 794 (6th Cir. 1994) (per curiam) ("The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once."); Bogle, 998 F.2d at 347-48 ("This court has consistently stated that the Secretary is not bound by the treating physician's opinions, and that such opinions receive great weight only if they are supported by sufficient clinical findings and are consistent with the evidence.").

Plaintiff fails to explain why the reasons the ALJ gave for giving Dr. Tomasic's opinions regarding Plaintiff's mental impairments and migraine headaches little weight

24

are not good reasons. Plaintiff takes issue only with the fact that the ALJ discredited Dr. Tomasic's opinion regarding fibromyalgia, and Plaintiff contends that the lack of objective support for Dr. Tomasic's opinion of the extent to which Plaintiff's fibromyalgia limited her ability to function is irrelevant because the symptoms and effects of fibromyalgia are entirely subjective. Indeed, the symptoms of fibromyalgia are subjective, and there are no laboratory tests for the presence or severity of fibromyalgia. *Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996).

Nevertheless, Plaintiff still fails to explain why the ALJ's other reasons—Dr. Tomasic's lack of expertise in neurological and autoimmune disorders, and the length of her treatment relationship with Plaintiff—do not constitute good reasons for giving her opinions little weight.

Furthermore, even if the reasons the ALJ gave for giving Dr. Tomasic's opinions little weight were not good reasons, remand would not be necessary. If an ALJ does not give good reasons for rejecting the opinion of a treating source, reversal and remand may not be required if the violation is *de minimis*. *Hall v. Comm'r of Soc. Sec.*, 148 F. App'x 456, 462 (6th Cir. 2005) (citing *Wilson*, 378 F.3d at 547). One example of a *de minimis* violation is "where the Commissioner has met the goal of 20 C.F.R. § 404.1527(d)(2)—the provision of the procedural safeguard of reasons—even though she has not complied with the terms of the regulation." *Id.* (quoting Wilson, 378 F.3d at 547). An ALJ may meet the goal of the good reasons requirement if she indirectly attacks both the supportability of the treating physician's opinions and the consistency of those opinions with the rest of the record evidence. *See Nelson v. Comm'r of Soc.*

25

*Sec.*, 195 F. App'x 462, 470 (6th Cir. 2006) (per curiam).

In *Nelson*, the court found that, although the ALJ failed to give good reasons for giving the opinions of two treating physicians little weight, the ALJ's analysis of the record evidence, including other opinion evidence contrary to the treating physicians' opinions, adequately addressed the treating physicians' opinions by indirectly attacking both their supportability and their consistency with the other record evidence. *Id.* at 472.  In other words, "[t]he ALJ implicitly provided sufficient reasons for not giving those opinions controlling weight, and indeed for giving them little or no weight overall." *Id.*

Although cases where the ALJ adequately addresses a treating physician's opinions through an indirect attack are rare, *id.*, the Court finds that this may be such a case.  The ALJ indirectly attacked Dr. Tomasic's opinions because those opinions largely appear to be based on Plaintiff's subjective statements, and the ALJ found Plaintiff's subjective statements unsupported, inconsistent, and not fully credible.  Specifically, the ALJ explained that she found Plaintiff's testimony regarding the extent to which her fibromyalgia limited her was not fully credible because Plaintiff testified that she suffered fibromyalgia for 19 years but was able to work during that time; there was insufficient medical evidence in the record to support her statements; what evidence there was in the record revealed that Plaintiff began complaining of fibromyalgia-related pain only in July 2009; Dr. Tomasic characterized Plaintiff's tenderness upon palpation as "mild"; and Dr. Magoline's physical examination revealed that Plaintiff had normal gait, full range of motion, normal muscle strength, and normal sensation.  (Tr. 83-84.)  The ALJ found Plaintiff's testimony about the extent to which her headaches limited her

26

was not fully credible because Plaintiff's testimony was inconsistent.  (Tr. 84.)  And the ALJ found Plaintiff's testimony about her mental impairments not fully credible because Plaintiff had no history of psychiatric hospitalization or counseling, and Plaintiff was not prescribed anti-depressant medication at the time of her hearing.  (Tr. 84.)

The ALJ also found that Dr. Lewin's and Dr. Magoline's assessments of Plaintiff's functional ability deserved weight because they were consistent with the rest of the evidence.  (Tr. 84.)  Plaintiff never challenged the ALJ's assessment of Plaintiff's credibility or the other opinion evidence.  Accordingly, and notwithstanding the specific reasons the ALJ gave for giving Dr. Tomasic's opinions little weight, the ALJ also indirectly attacked Dr. Tomasic's opinions and implicitly provided sufficient reasons for giving them little weight.  Therefore, remand is not warranted.

### D.    The ALJ's Consideration of Plaintiff's Third-Party Reports

Plaintiff contends that the ALJ failed to comply with Social Security Rulings 96-7p and 06-3p because she failed to address Plaintiff's third-party reports from her friend, father, and mother and explain the weight she gave to those reports.  Plaintiff explains that this prejudiced her because the third-party reports corroborate Plaintiff's testimony of the extent to which she is limited by her impairments.  For the following reasons, this assignment of error lacks merit.

The Social Security Rulings provides that, in determining the credibility of a claimant's statements, the ALJ must consider the entire case record, including statements from "other sources" including a claimant's spouse, parent, or friend.  S.S.R. 96-7p, 1996 WL 374186, at *1 (S.S.A.); *see* S.S.R. 06-03p, 2006 WL 2329939, at *1

(S.S.A.).  Although information from "other sources" cannot determine the existence of

a medically determinable impairment, it can provide insight into the severity of the

impairment and how it affects the individual's ability to function.  S.S.R. 06-3p, 2006 WL

2329939, at *2.

The ALJ stated that she made her RFC determination "[a]fter careful

consideration of the entire record," but she did not address the third-party reports

directly.  Plaintiff contends that S.S.R. 96-7p required the ALJ to address the third-party

reports directly and explain her reasons for the weight she gave them.  This reading of

the Social Security Regulations is wholly unsupported:

> Although there is a distinction between what an adjudicator must consider
> and what the adjudicator must explain in the disability determination or
> decision, the adjudicator generally *should* explain the weight given to
> opinions from these "other sources," or otherwise ensure that the discussion
> of the evidence in the determination or decision allows a claimant or
> subsequent reviewer to follow the adjudicator's reasoning, when such
> opinions may have an effect on the outcome of the case.

S.S.R. 06-03p, 2006 WL 2329939, at *6 (emphasis added).  An ALJ can consider all

the evidence without directly addressing in his written decision every piece of evidence

submitted by a party; and an ALJ is not required to make explicit credibility findings as

to each bit of conflicting testimony so long as his factual findings as a whole show that

he implicitly resolved such conflicts.  *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x

496, 508 (6th Cir. 2006) (per curiam) (quoting *Loral Def. Sys.-Akron v. N.L.R.B.*, 200

F.3d 436, 453 (6th Cir.1999)).  Accordingly, Plaintiff's contention that the ALJ violated

the Social Security Rulings by failing to discuss and explain the weight she gave to the

third-party reports lacks merit.

Further, Plaintiff's contention that she was prejudiced by the ALJ's failure to

discuss the third-party reports lacks merit because the third-party reports are not consistent with each other and do not necessarily support Plaintiff's credibility.  For example, although Plaintiff's husband believed that Plaintiff's activities of daily living were markedly limited by her obesity, Plaintiff's friend believed Plaintiff was moderately limited and Plaintiff's mother believed Plaintiff was mildly limited.

And whether any of the third-party reports support Plaintiff's credibility is irrelevant, as Plaintiff has not otherwise taken issue with the ALJ's assessment of her credibility and a review of the ALJ's credibility assessment reveals that it is supported by substantial evidence.  Accordingly, and for the foregoing reasons, this assignment of error lacks merit.

### E.    The ALJ's Assessment of Plaintiff's Obesity

The Social Security Administration ("SSA") considers obesity to be a medically determinable impairment.  S.S.R. 02-1p, Introduction, 2000 WL 628049, at *1 (S.S.A.).  Obesity used to be included as an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings"), but in 1999 the SSA deleted that listing; however, the SSA added paragraphs to the prefaces of the musculoskeletal, respiratory, and cardiovascular body system listings that provide guidance about the potential effects obesity has in causing or contributing to impairments in those body systems.  _Id._  The SSA also recognizes that obesity may cause or contribute to mental impairments such as depression or the loss of mental clarity due to obesity-related sleep apnea.  S.S.R. 02-1p, Policy Interpretation Question 2, 2000 WL 628049, at *3.

Plaintiff contends that "[t]he ALJ clearly violated SSR 02-1p" by failing to

consider her obesity under the Listings and in her RFC assessment.  (Pl.'s Br. 15.)  But Social Security Ruling 02-01p does not mandate a particular mode of analysis of obesity, as it states only that obesity, in combination with other impairments, "may" increase the severity of the other limitations.  *Bledsoe v. Barnhart*, 165 F. App'x 408, 411-12 (6th Cir. 2006) ("It is a mischaracterization to suggest that Social Security Ruling 02-01p offers any particular procedural mode of analysis for obese disability claimants.").  Accordingly, to the extent that Plaintiff argues that the ALJ violated Social Security Ruling 02-01p by failing to perform an analysis of Plaintiff's obesity in a particular manner, this argument lacks merit.

Nevertheless, the ALJ must compare the medical evidence with the requirements for impairments in the Listings when considering whether a claimant's impairments, either singly or in combination, meet or medically equal any impairments in the Listings, *Reynolds v. Comm'r of Soc. Sec.*, 414 F. App'x 411, 414 (6th Cir. 2011), and the ALJ must consider all of a claimant's impairments, severe and not severe, when assessing the claimant's RFC, *see* 20 C.F.R. § 404.1545(e).  Here, there is no evidence that Plaintiff was clinically diagnosed with obesity and was assigned limitations based on that condition.  The ALJ found Plaintiff's obesity to be a severe impairment based on her height and weight[7] and explained that the claimant's

---

[7] The Social Security Rulings provide that an ALJ may determine that a claimant is obese based on notes in the medical evidence that reveals a consistently high body weight:

> When the evidence in a case does not include a diagnosis of obesity, but does include clinical notes or other medical records showing consistently high body weight or BMI, we may ask a medical source to clarify whether the individual has obesity.  However, in most such

impairments, considered both singly and in combination, did not meet or medically equal the requirements of any of the impairments set forth in the Listings regarding neurological, autoimmune, or mental disorders.  (Tr. 80-81.)  Further, the ALJ explained that she considered the entire case record, including all of Plaintiff's symptoms, in determining Plaintiff's RFC.  (Tr. 82.)  Indeed, the ALJ noted that Dr. Magoline found Plaintiff had a normal gait, full range of motion in her spine, and full muscle strength. (Tr. 84.)  Plaintiff has not explained what evidence regarding obesity the ALJ failed to consider and how that evidence supports her claims for disability.  The Court finds no basis to conclude that the ALJ failed to consider Plaintiff's obesity.  Accordingly, this assignment of error lacks merit.

## VI.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date:  February 2, 2012

## OBJECTIONS
**Any objections to this Report and Recommendation must be filed with the**

---

cases we will use our judgment to establish the presence of obesity based on the medical findings and other evidence in the case record, even if a treating or examining source has not indicated a diagnosis of obesity.  Generally, we will not purchase a consultative examination just to establish the diagnosis of obesity.

S.S.R. 02-1p, 2000 WL 628049, at *3.

**Clerk of Courts within fourteen (14) days of this notice.  28 U.S.C. § 636(b)(1).
Failure to file objections within the specified time may waive the right to appeal
the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir.
1981); *Thomas v. Arn*, 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).**